

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 2:18-CR-00366 |
| | * | |
| VERSUS | * | JUDGE |
| | * | MAGISTRATE JUDGE KAY |
| INTERORIENT MARINE | * | |
| SERVICES LIMITED | * | |

## STIPULATED FACTUAL BASIS FOR GUILTY PLEA

The United States of America, by and through David C. Joseph, United States Attorney for the Western District of Louisiana, JEAN WILLIAMS, Assistant Attorney General of the Environment and Natural Resources Division, Daniel J. McCoy, Assistant United States Attorney, and Stephen Da Ponte, Trial Attorney, and the defendant, INTERORIENT MARINE SERVICES LIMITED ("INTERORIENT"), represented by its undersigned counsel, for the purposes of providing the Court with a factual basis for a guilty plea pursuant to Rule 11(b)(3) of the Federal Rules of Criminal Procedure, hereby stipulate as follows. The parties agree that this statement of facts is sufficient to support a plea of guilty to the charge, as well as the agreed sentence, conditions of probation and fine. The statement of facts is not meant to be a complete recitation of all facts known to either party that relate to the conduct.

## A.    THE DEFENDANT

1. Defendant **INTERORIENT** was a company incorporated in the Republic of Cyprus with its principal place of business located at Fragklinou Rousvelt, 142, 3011, Limassol, Cyprus. At all relevant times, INTERORIENT served as the operator of the tank vessel *Ridgebury Alexandra Z.*

## B.    THE VESSEL

1.    The tank vessel *Ridgebury Alexandra Z* (International Maritime Organization Number 9439785) was a 29,905 gross ton vessel, registered and operated under the flag state administration of the Republic of the Marshall Islands.

2.    The *Ridgebury Alexandra Z* was engaged in international commercial maritime operations transporting petroleum and other liquid products to and from Lake Charles, Louisiana, and elsewhere.

3.   The *Ridgebury Alexandra Z* had a "Chief Officer," assigned as the person with overall charge and responsibility for the vessel's cargo and deck spaces. The Chief Officer was responsible for, among other things, shipboard control of cargo space oily wastes and oil residues. The Chief Officer was an agent or employee of INTERORIENT, the corporate operator of the *Ridgebury Alexandra Z,* and he acted within the scope of his agency or employment with INTERORIENT when serving onboard the *Ridgebury Alexandra Z.*

4. The *Ridgebury Alexandra Z* had a "Chief Engineer," assigned as the person in charge of the vessel's engine room. As such, the Chief Engineer was responsible for, among other things, shipboard control of machinery space waste, to include

sludge and oily bilge water. The Chief Engineer was an agent or employee of INTERORIENT, the corporate operator of the *Ridgebury Alexandra Z,* and he acted within the scope of his agency or employment with INTERORIENT when serving onboard the *Ridgebury Alexandra Z.*

## C.   LEGAL FRAMEWORK

1.  The United States is a signatory to the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 ("MARPOL").

2.   MARPOL was enacted into United States law by the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901, *et seq.* APPS makes it a crime for any person to knowingly violate MARPOL, APPS, or regulations promulgated under APPS. The regulations promulgated under APPS apply to all vessels that operate under the authority of a country other than the United States while in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States as to oil pollution (33 C.F.R. § 151.09(a)(5)).

3. Consistent with the requirements contained in MARPOL Annex I, the APPS regulations require that each tank vessel of more than 150 gross tons maintain an Oil Record Book in which various operations must be recorded, including the discharge of water from slop tanks, the disposal of oily bilge water which has accumulated in machinery spaces, and any failure of the oil discharge monitoring and control system. The oil discharge monitoring and control system, often referred to as the oil discharge monitoring equipment (hereinafter ODME), is a system that monitors the discharge into the sea of oily ballast or other oil-contaminated water from the cargo

tank areas. It comprises an oil content meter (hereinafter ODME-OCM), a flow rate indicating system, a ship speed indicating device, a ship position indicating device, a sampling system, a starting interlock, and a control section. 33 C.F.R. § 157.12d(a)(4).

4.  These operations must be fully and accurately recorded in the Oil Record Book by the person or persons in charge of the operations. 33 C.F.R. § 151.25(d) and (e). The Oil Record Book must also record any emergency, accidental, or other exceptional discharges of oil or oily mixtures.  33 C.F.R. § 151.25(g). The Oil Record Book must be maintained onboard the vessel and be readily available for inspection. 33 C.F.R. § 151.25 (j).

5.  The U.S. Coast Guard, an agency of the United States Department of Homeland Security, is charged with enforcing the laws of the United States and is empowered under 14 U.S.C. § 89(a), to board vessels and conduct inspections and investigations of potential violations and to determine compliance with MARPOL, APPS, and related regulations. One of the inspections and investigations the U.S. Coast Guard can conduct is the Port State Control Examination, which involves boarding a vessel, inspecting equipment and records and investigating potential violations of the law. Failure to comply with international standards, including MARPOL, can form the basis of an order to refuse to allow a vessel to enter port, or to prohibit the vessel from leaving port without remedial action until the U.S. Coast Guard determines that the vessel does not present an unreasonable threat to the marine environment. 33 C.F.R. § 151.07(b). The U.S. Coast Guard is specifically authorized to examine a vessel's Oil Record Book to determine, among other things,

whether the vessel has operable pollution prevention equipment and appropriate procedures, whether it poses any danger to United States ports and waters, a n d whether the vessel discharged any oil or oily mixtures in violation of MARPOL, APPS, or any other applicable federal regulation. 33 C.F.R. § 151.23(a)(3) and (c).

**D.      THE INVESTIGATION**

1.   On or about September 8, 2017, the U.S. Coast Guard conducted an inspection of the tank vessel *Ridgebury Alexandra Z.* During the inspection, a crewmember approached the Coast Guard inspectors and handed them an electronic storage device containing videos and photographs of the vessel's ODME being flushed with a fresh water hose, allowing oil cargo residue and machinery space bilge water to be discharged overboard into the ocean from the Port Slop Tank in excess of permissible limits. Coast Guard inspectors were told that the Chief Officer had ordered a fresh water hose to be connected to the ODME in order to facilitate the discharge. During interviews of crewmembers, the Coast Guard inspectors were told that the vessel's Chief Engineer had on two previous occasions, transferred oily bilge water from the Bilge Holding Tank in the engine room to the Port Slop Tank with the intent to limit the use of the vessel's Oil Water Separator. Neither of these two transfers were recorded by the Chief Engineer or the Chief Officer in the vessel's Oil Record Book Part 1 or Part 2 as required by law.

2.   After the first transfer from the Bilge Holding Tank to the Port Slop Tank, the Chief Officer made the following entry in the Oil Record Book Part 2:

10 June 2017: Annual pressure test of: Tank cleaning hose; Emergency Frams Pump; Hose for Emergency Frams Pump. Test water transferred to Slop (P) Ullage: 15.40

The above entry was signed by the Chief Officer on June 10, 2017. This entry is false, and was made by the Chief Officer to hide the transfer of oily waste from the Bilge Holding Tank to the Port Slop Tank.

3.  On or about July 14, 2017, the Chief Officer attempted to discharge the oily waste contained in the Port Slop Tank properly through the vessel's ODME. However, the ODME-OCM detected that the effluent contained too much oil. This prevented the discharge of the oily waste through the ODME.

4.  On or about July 15, 2017, the Chief Officer attempted to discharge the oily waste contained in the Port Slop Tank properly through the vessel's ODME. Again, the ODME-OCM detected that the effluent contained too much oil, and the ODME prevented the discharge.

5.  The Chief Officer showed one of his subordinates how to connect a fresh water hose to the ODME sample line to trick the ODME-OCM, and the subordinate made the connection.

6.  The Chief Officer made an entry in the Oil Record Book on July 15, 2017, recording the discharge of 332 cubic meters (87,705 U.S. gallons) of oily wastewater. In this entry, the Chief Officer noted that the ODME was used to make this discharge. However, the Chief Officer made this entry knowing that the ODME-OCM was in fact flushed with freshwater to trick it into allowing the discharge.

7.  After the fresh water hose was removed from the ODME sample line, the Chief Officer ordered one of his subordinates to paint the sample line connections to conceal the fact that the connections had been tampered with. Additionally, when the U.S. Coast Guard inspectors asked the Chief Officer if he knew anything about the ODME being tampered with, he said that he did not when in fact he did.

8.  On two occasions, the vessel's Chief Engineer transferred oily bilge water from the Bilge Holding Tank in the engine room to the Port Slop Tank, and did not record the transfers in the vessel's Oil Record Book. In order to make these transfers from the Bilge Holding Tank to the Port Slop Tank, the Chief Engineer had to remove and replace seals on valves in the engine room. The purpose of these seals was to prevent the transfer of oily waste.

9.  During the Coast Guard inspection, the Chief Engineer was asked by the Coast Guard if he had ever transferred oily waste from the engine room to the slop tanks. The Chief Engineer stated that no, he had never done that, when in fact he had. The Chief Engineer also falsified the vessel's seal log in order to hide the fact that he had twice replaced the seals on the valves that were opened to make the transfers. Finally, on several occasions, the Chief Engineer asked one of his subordinate crewmembers not to tell the Coast Guard about the use of the incinerator at the anchorage. The Chief Engineer never logged this incinerator use in the Oil Record Book as required by the applicable regulations.

10. On or about September 8, 2017, the *Ridgebury Alexandra Z* called at the port of Lake Charles. While in United States waters, at least two members of the vessel's crew knowingly failed to maintain an accurate Oil Record Book in violation of 33 USC 1908(a), as the above mentioned internal transfers of oily bilge water and the overboard discharge of the Port Slop Tank were not accurately recorded in the Oil Record Book.

Dated: 2/6/19

BRITON P. SPARKMAN, Esq.
Authorized Representative on Behalf of
INTERORIENT MARINE SERVICES LIMITED,
Defendant

Dated: 2/6/19

GEORGE M. CHALOS, Esq.
Attorney for Defendant
55 Hamilton Avenue
Oyster Bay, NY, 11771
Telephone:  (516) 714-4300

DAVID C. JOSEPH
United States Attorney

Dated: 2/6/19

DANIEL J. McCOY, La. Bar No. 29334
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Telephone:  (337) 262-6618

JEAN E. WILLIAMS
Deputy Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Dated: 2/6/19

STEPHEN DA PONTE, Fla. Bar No. 58454
Trial Attorney
Environmental Crimes Section
Environment and Natural Resources Division
U.S. Department of Justice
601 D. Street, N.W.
Washington, DC 20530
Telephone:  (202) 305-2729

Interorient Marine Services Limited
Factual Stipulation - Page 9 of 9